James E. GLATTLY, David Molina, Specialized Components, Inc., Andrew Boyd, ABCO Products, Inc. and Filiberto Fuentes, Jr., Appellant,

v.

## AIR STARTER COMPONENTS, INC., Appellee.

No. 01–09–00098–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 7, 2010.

Rehearing and En Banc Reconsideration Overruled Jan. 26, 2011.

Richard G. Wilson, Kerr Wilson PC, Charles G. King, King & Pennington, L.L.P., James P. Pennington, Law Office of James Pennington, Houston, TX, for Appellant.

Corwin L. Teltschik, L.T. "Butch" Bradt, Betsy L. Grubbs, Teltschik Associates, P.C., Houston, TX, for Appellee.

Panel consists of Justices JENNINGS, ALCALA, and MASSENGALE.

## OPINION

ELSA ALCALA, Justice.

This appeal primarily concerns a claim that a newly formed company misappropri-

ated the trade secrets of an established company. Air Starter Components, Inc. ("Air Starter"), the established company, obtained a judgment for misappropriation of trade secrets against the newly formed company, Specialized Components, Inc. ("Specialized"), its shareholders James E. Glattly, David Molina, Andrew Boyd, and its salesman, Filiberto Fuentes Jr., jointly and severally for $168,036. Air Starter also obtained a judgment for tortious interference with contract for $600,000 against the same parties, as well as another company, ABCO Products, Inc., jointly and severally. In addition to damages, Air Starter received an injunction prohibiting Specialized, Glattly, and Molina from using Air Starter's trade secrets.

All of the parties filed notices of appeal. In one appeal, Specialized, Glattly, and Molina contend that the trial court's judgment is erroneous because (1) Air Starter did not prove its damages for lost profits with reasonable certainty, (2) as a matter of law, there can be no tortious interference with an unenforceable covenant not to compete, (3) there is no evidence to pierce the corporate veil to hold Glattly and Molina, as shareholders, personally liable for the corporate obligations of Specialized, and (4) Glattly is not liable for misappropriation of trade secrets.

Boyd, Fuentes, and ABCO raise similar issues in another appeal, asserting the trial court erred because (1) lost profits were not proven to a reasonable certainty, (2) an unenforceable covenant not to compete cannot be the basis of a tortious interference with contract claim, and (3) there is no evidence to support piercing the corporate veil to hold Boyd and Fuentes liable for Specialized's obligations.

Air Starter raises eight issues in its appeal. It contends the trial court erred

by determining that the contract with Fuentes was a covenant not to compete because res judicata prevented the trial court from addressing issues that had been raised in the temporary injunction hearing; by finding that the language of the agreement indicates it is not a covenant not to compete; by failing to award attorney's fees to Air Starter on its Texas Theft Liability Act claim; by entering an injunction that prohibited use of trade secrets for a period of 30 years rather than permanently; by failing to award attorney's fees to Air Starter for breach of contract; and by failing to require Specialized to provide Air Starter complete, un-redacted copies of Specialized's hard-drives during discovery.

We conclude there is no evidence to support the jury's award for lost profits damages. Accordingly, we reverse that portion of the trial court's judgment awarding Air Starter damages and render judgment that Air Starter take nothing on its claim for damages. We further conclude the trial court abused its discretion in limiting the injunction prohibiting Specialized, Glattly, and Molina from using Air Starter's trade secrets to a term of 30 years. We therefore modify that portion of the trial court's judgment to exclude the time limit and, as modified, affirm.

## I. Background

In setting out the background for this case, we discuss (A) an overview of the parties involved, (B) the relationship of the parties leading up to the lawsuit, and (C) the lawsuit.

### A. Overview of Parties

Air Starter is one of the oldest and largest companies in the after-market air starter business.[1] Jack Heck is the owner

1. Air starters are used on almost every type of large diesel engine equipment in the world, including buses, trains, barges, cranes, large trucks, and on turbines used in the oil and gas

and president of Air Starter. Air Starter manufactures, repairs, refurbishes, and sells air starters and component parts to customers all over the world. Air Starter makes some, but not all, of the air starter parts it sells. Other parts that Air Starter sells are made for Air Starter by "job shop machine shops," including, for a while, Specialized. On several occasions, Air Starter provided Specialized with drawings to be used by Specialized to bid or make a part for Air Starter.

Molina went to work for Air Starter in the early 1990s as a starter technician. A starter technician rebuilds and refurbishes old air starters that are sent in to be repaired or replaced. While working at Air Starter, Molina attended school at night to learn AutoCAD, a computer-aided software program used for design and drafting. Molina began making AutoCAD drawings for many of the air starter parts made by Air Starter. Much of this work was done at home, on his own computer and time. Molina took the drawings back and forth from his home to the Air Starter shop on floppy disks and often used the drawings to answer questions raised in late night calls from the night production shift.

Fuentes went to work for Air Starter in April 1992 cleaning and repairing air starters. In 1996, Fuentes was promoted into sales. Fuentes was initially assigned responsibility for sales in the East Coast region, but the sales territory changed to South Texas, and then it changed to international sales where he remained until leaving Air Starter in June 2002.

When it was started in 1996, Specialized began as a "job shop machine shop" specializing in precision machining. A job shop machine shop makes parts on an order-by-order basis using specifications or designs provided by the customer. Air Starter was a Specialized customer. Glattly and Bob Morson were the original shareholders of Specialized. In early 2001, Glattly, seeking to expand Specialized, brought in additional investors Boyd, Richard Kellogg, and Jerry Ward to become shareholders of Specialized.

Boyd is the owner of ABCO Products, Inc. ("ABCO"). ABCO was one of Specialized's earliest and best customers. Another company owned by Boyd, MPV, was also an early customer of Specialized. At the beginning of 2002, Boyd became a director of Specialized.

## B. Relationship of Parties Leading up to the Lawsuit

Three events are the primary reasons for the disagreements between Air Starter and Specialized: (1) Molina left Air Starter to work for Specialized; (2) Specialized expanded into the air starter market; and (3) Fuentes left Air Starter to work for Specialized.

### 1. Molina becomes employed by Specialized

In 2001, Specialized decided to hire another machinist to help with backlogged orders and to allow Morson to concentrate his work efforts on sales. Morson knew Molina from delivering parts to Air Starter and suggested that they consider him. Morson spoke to Molina on several occasions about coming to work for Specialized. In March 2001, Specialized offered Molina a job as Production Manager, with benefits that included a small stock position and starting bonus. Unhappy at Air Starter,

industry for power generation and compression. Ingersoll Rand developed and patented many of the original air starters and their component parts. As those patents expired, a substantial after-market developed for "knockoffs" of the Ingersoll Rand parts. A number of companies compete in this market.

Molina was looking to make a change, and he started work at Specialized on April 2, 2001.

While at Air Starter, Molina had maintained the files that contained the drawings and production information for each product that Air Starter manufactured. Molina kept these documents in a filing cabinet in the machine shop. Shortly after Molina left Air Starter, Air Starter discovered that many of the files in the machine-shop filing cabinet were empty. Use of these drawings could save two or more weeks in the production of the products.

One month after Molina's departure, Air Starter's general manager recovered from Specialized a sealed box that was located in Molina's office at Specialized. The box had been taken from Air Starter's premises the previous day by an Air Starter employee who claimed that he had taken the box to Molina at Molina's request. The box contained the raw castings of one rotor, a "completely machined" rotor, and a pinion gear, as well as drawings for parts. Two months after the employee brought the box to Molina, Specialized began producing parts corresponding to the drawings in the box.

With Molina's help, Specialized had caught up on the backlog of orders that had existed when he started work. Morson and Molina began looking for additional machining work. Morson contacted Air Myte about the possibility of Specialized machining some parts for Air Myte. Over the next six months, Specialized received four orders from Air Myte to make air starter parts. For each order, Air Myte provided Specialized with a drawing, dimensions, or an original part to be copied.

During this same period, ASAP, a company that was just getting started in the after-market air starter business, was looking for a machine shop to make and supply its parts. ASAP contacted Special-

ized about that work. After a number of meetings, an agreement was reached for Specialized to make the parts for ASAP. ASAP provided original Ingersoll Rand parts for Specialized to copy. Specialized continued to make parts for ASAP and Air Myte through the remainder of 2001 and early 2002 on an order-by-order basis. Specialized also continued to do non-air starter machine shop work for other customers.

### 2. Specialized expands into the air starter market

In early 2002, Specialized decided to expand into the air starter business. First, as it became more knowledgeable about this business, Specialized learned that it was more profitable for it to sell the air starter products it was making to the end-users rather than simply machining the parts for companies like ASAP and Air Myte.

Around this same time, Specialized decided to expand its board of directors. Boyd, Kellogg, Ward, and Molina joined Glattly as directors in February 2002. During this same period, Morson left Specialized. Morson's departure led to the loss of much of the non-air starter machining business that he had generated. As a result, Specialized decided to focus its efforts on expanding its air starter business to move from a job shop to a production shop.

### 3. Fuentes goes to work for Specialized

In order to move from a job shop to a production shop, Specialized needed additional customers. Therefore, Specialized decided to look for a salesperson. Molina had worked with Fuentes at Air Starter and suggested that Specialized talk to him. Molina and Boyd both had several discus-

sions with Fuentes. Boyd reported to the Specialized directors that Fuentes was unhappy and looking to leave Air Starter but wanted the security of working for a more established company. To meet his desire, ABCO offered Fuentes a part-time salesperson job at ABCO, with the understanding that ABCO would bill Specialized for any time Fuentes spent working on Specialized business. Fuentes started work at ABCO on July 1, 2002. However, Fuentes devoted virtually all his time to generating a potential customer list for Specialized.

While working at Air Starter, Fuentes had developed and expanded the company's existing client base. As a member of the Air Starter staff, Fuentes had access to customer data stored on password-protected computer files and on a backup rolodex. Six months before leaving Air Starter, Fuentes signed a nondisclosure agreement contained within his contract in June 2002 (hereafter the "Fuentes contract"). The contract specified that customer names, customer addresses, and price lists were Air Starter's "sole confidential property." Vicky Holly, a co-worker of Fuentes at ABCO testified that Fuentes stated he had taken a customer list from Air Starter and was entering it into the computer for use in his new job as salesman for Specialized.

In September 2002, Specialized was ready to enter the after-market air starter business. On September 16, 2002, Fuentes became a full-time employee of Specialized. Fuentes began sending sales letters and calling potential customers. Flyers also advertised that Specialized was open for business. Customers began calling Specialized for parts.

## C. The Lawsuit

After Specialized began its air starter business in September 2002, Air Starter sued Molina, Fuentes, and Specialized, alleging misappropriation of trade secrets, violations of the Texas Theft Liability Act, conversion, breach of contract, unfair competition, and tortious interference with existing and prospective customer relationships. Air Starter sought and obtained temporary injunctions from the trial court. The temporary injunctions prohibited the defendants from communicating with certain customers and from selling certain air starter parts. Molina, Fuentes, and Specialized appealed the trial court's grant of a temporary injunction. This Court found that the trial court did not abuse its discretion in granting a temporary injunction to maintain the status quo. *See Molina v. Air Starter Components, Inc.,* No. 01–03–00175–CV, 2004 WL 1277491, at *9 (Tex. App.-Houston [1st Dist.] June 10, 2004, pet. denied) (mem. op., not designated for publication).

Over the course of the trial court proceedings, Air Starter added defendants including the shareholders and directors of Specialized (Glattly, Boyd, Kellogg, and Ward), other ex-employees of Air Starter (Brian Wilson and Miguel Matamoros), a customer who did business with Specialized (Above and Beyond Compression), and a company that packaged some parts for Fuentes (Universal Starter). Air Starter also added a Racketeer Influenced and Corrupt Organizations ("RICO") claim. *See* 18 U.S.C. §§ 1961–1968. The case was tried to a jury for approximately four weeks in September 2007.

At the close of Air Starter's case, the trial court directed a verdict in favor of defendants Wilson and Matamoros. The jury returned a verdict partially in favor of Air Starter and partially in favor of the defendants. Two of the defendants, Kellogg and Ward, were found to have no liability on any of the claims asserted by Air Starter. The jury found no liability on the RICO and conversion claims. Although it found liability for the breach of

contract and Texas Theft Liability Act claims, the jury awarded no damages for either of these claims.

The jury did find a misappropriation of trade secrets concerning Air Starter's drawings as to Molina, Glattly, and Specialized. The jury found the damages for the misappropriation to be $168,036.25 for lost profits. The jury also found liability for tortious interference with the Fuentes contract as to Glattly, Specialized, Boyd, and ABCO, and awarded damages of $600,000 for lost profits. Furthermore, the jury found shareholders Glattly, Molina, Boyd, and Fuentes responsible for the obligations of Specialized.

The trial court conducted post-trial hearings over the next year. During one of these hearings, the trial court decided that the Fuentes contract was, in part, a covenant not to compete. The trial court also determined that the covenant not to compete did not contain a reasonable limit with respect to time and the court reformed it to limit Fuentes from competing for a period of two years. The trial court rendered judgment granting Air Starter the following relief:

- a judgment for $168,036.25 against Specialized, Glattly, Boyd, and Fuentes, jointly and severally for misappropriation of trade secrets;
- a judgment for $600,000 against Specialized, Glattly, Boyd, Fuentes, and ABCO, jointly and severally, for tortious interference with contract;
- an injunction prohibiting Specialized, Glattly, and Molina from using Air Starter's trade secrets; and
- an injunction prohibiting Fuentes from competing with Air Starter for two years.

Glattly, Molina, and Specialized (collectively, the "Glattly parties") appealed from that judgment. Boyd, Fuentes, and ABCO (collectively, "the Boyd parties")

also filed their own notice of appeal, as did Air Starter.

## II. Glattly Parties' and Boyd Parties' Appeals

In the Glattly parties' first issue and the Boyd parties' fourth issue, they contend the evidence is insufficient to prove lost profits as a matter of law. Because we agree, we render judgment in favor of the Glattly parties and the Boyd parties.

### A. Jury's Findings

The jury provided an amount for damages for lost profits in response to two questions. First, after finding that Specialized, Glattly, and Molina were liable for misappropriation of the drawings that constituted Air Starter's trade secrets, the jury answered Question 3, the damages question. The only element of damages the jury was asked to find was Air Starter's lost profits. The jury found Air Starter's lost profits from the misappropriation of the drawings to be $168,036.25.

Second, the jury found in response to Questions 13 and 14 that Specialized, Glattly, Boyd, and ABCO were liable for tortiously interfering with the Fuentes contract. In response to Question 16, the jury was asked to find the damages, if any, Air Starter suffered in the form of lost profits due to the tortious interference with the Fuentes contract. The jury found $600,000 in lost profits damages.

### B. Applicable Law and Standard of Review

 The Supreme Court of Texas recently stated,

The rule concerning adequate evidence of lost profit damages is well established:

Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the in-

jured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 878–79 (Tex.2010) (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992)).

██ "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits." *Holt Atherton Indus., Inc.*, 835 S.W.2d at 85. "Recovery of lost profits must be predicated on one complete calculation." *Id.* "The plaintiff bears the burden of providing evidence supporting a single complete calculation of lost profits, which may often require certain credits and expenses." *ERI Consulting*, 318 S.W.3d at 878.

We must review the legal sufficiency of the competent evidence to determine whether it established with reasonable certainty the amount of lost profits damages awarded by the trial court. *See id.* at 876–77. In so doing, we "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). If the evidence "would enable reasonable

and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id.* at 822. "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *Id.* Although the reviewing court must "consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it[,] ... if the evidence allows of only one inference, neither jurors nor the reviewing court may disregard it." *Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

A no-evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003); *Heritage Housing Dev., Inc. v. Carr*, 199 S.W.3d 560, 565 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

### C. The Evidence

Air Starter presented evidence of its lost profits through Patrice Ferguson, a certified public accountant with experience calculating lost profits. Ferguson testified that Air Starter's profits lost to Specialized were $538,715. Ferguson testified that Air Starter's profits lost to Global Pneumatics [2] were $597,685.

---

**2.** Global Pneumatics was the assumed name used by Fuentes in his business repairing and rebuilding air starters after Specialized ceased doing business. There is no evidence that Molina, Glattly, Boyd, or Specialized had anything to do with Global Pneumatics.

In making her damage calculation, Ferguson assumed Specialized received an unfair advantage from possessing Air Starter's drawings and customer list. Ferguson further assumed that every sale ever made by Specialized would have been made by Air Starter and estimated the profits Air Starter would have made on those sales. No evidence was presented to support these assumptions. Ferguson also testified she applied the profit margin Heck provided to her, which was based on all of Air Starter's business, not a profit margin tied to a particular product or a particular customer. No other evidence was presented to support the profit margin.

Heck did not testify that he would have made 100 percent of the sales by Specialized, nor did he testify concerning his profit margins in general or for specific customers or products. Heck did testify concerning three customers, stating that Above & Beyond Compression was "a good customer, about $75,000 dollars a year"; Engines Accessories & Controls was "approximately $80,000, $90,000 dollars a year"; and Gulf Coast Ignition was "probably $30,000, $40,000 dollars." However, Heck did not state whether those numbers represented gross income or profits from those three customers. Invoices were also introduced showing that Air Starter had made sales to customers to whom Specialized later made sales. However, neither the invoices nor evidence from any other source showed that all of Specialized's sales, or any particular sales, would have been made by Air Starter.

On cross-examination, Ferguson stated that she did not verify that any of Specialized's sales would have been made by Air Starter. Ferguson did not contact any customers or review the depositions of any customers. In her calculation of lost prof-

its, Ferguson included sales to customers to whom Air Starter had quit selling for various reasons. Ferguson included in her calculations sales to customers that had quit buying from Air Starter because of dissatisfaction with Air Starter and had gone to other suppliers for their needs. She also included in her calculations job shop machine shop work that is not a type of work performed by Air Starter.

Ferguson also stated that she had not been asked to make separate calculations of damages for misappropriation of Air Starter's drawings or for tortious interference with the Fuentes contract and that she was not offering a separate opinion on damages related to only the drawings or the tortious interference. Ferguson testified that she had never been provided with any of the drawings, a list of the drawings, or a list of the parts shown on those drawings. Consequently, she stated she did not know whether Specialized had ever made any of the parts shown on the drawings or sold those parts.

Evidence was also elicited from several of the customers at issue in this case to demonstrate that not all sales by Specialized otherwise would have been made by Air Starter. For example, one of the customers was a company named Carlson and Beauloye. Its representative, Valerie Beauloye, testified that she first made a purchase from Specialized when Air Starter did not have the part she needed in stock. She also testified that she had become dissatisfied with Air Starter because it repeatedly sent her the wrong parts on an order for a customer of hers. As a result, she lost the customer account that was worth between $2,800 and $5,000 a month. Air Starter also increased the prices it was charging her, so she began alternating orders between Air Starter and Specialized, comparison shopping to find the best price.

Another customer, Above & Beyond Compression, testified through its representative, Gary Mills. Above & Beyond bought air starters and air starter components from multiple companies, including Air Starter. When it became dissatisfied with the level of service from Air Starter, Above & Beyond began to look for another vendor and was referred to Specialized. Above & Beyond continued doing business with Air Starter as well as Specialized and three other vendors.

Dieseltron, another customer, testified through its representative, Gilda Schroer. Schroer testified that Dieseltron began buying parts after Air Starter required it to begin placing orders with a local vendor, Dynatron. However, Dynatron charged significantly more for the same parts that Dieseltron had been buying directly from Air Starter. Dieseltron found Specialized when it began looking for another vendor.

## D. Analysis of Lost Profits Due to Tortious Interference

■ The issue we must decide is whether Air Starter proved the amount of lost profits "by competent evidence with reasonable certainty." *See ERI Consulting*, 318 S.W.3d at 876 (quoting *Holt Atherton*, 835 S.W.2d at 84). Air Starter had the burden of "providing evidence supporting a single complete calculation of lost profits." *See id.*

Ferguson's opinion on lost profits assumed that 100 percent of Specialized's sales would have been made by Air Starter. However, there is no evidentiary basis for that assumption. Ferguson testified that Heck told her to make this assumption. She did no independent work to verify this assumption and did not review the depositions of customers. No evidence in the record from any source shows that all of Specialized's sales would have been made by Air Starter. The undisputed evidence establishes that at least some of the

sales Ferguson included would not have been made by Air Starter—either because the customers had ceased doing business with Air Starter for other reasons or because the sale was for a type of work not provided by Air Starter.

Additionally, Ferguson used an average profit margin for all of Air Starter's sales, not a profit margin associated with a particular product or customer. Ferguson also made her calculation for lost profits based on Specialized having both misappropriated drawings and a customer list. However, the jury was not asked to provide an amount of lost profits for both the misappropriated drawings and the customer list. The jury was asked two separate questions concerning lost profits. The jury was asked to find the amount of lost profits resulting from the misappropriation of the drawings in Question 3 and answered $168,036.25. In response to Question 16, which asked for the determination of lost profits due to the tortious interference with the Fuentes contract, the jury answered $600,000.

Under these facts, we conclude that Air Starter did not prove the amount of its lost profits to a reasonable certainty. *See Holt Atherton*, 835 S.W.2d at 85–86; *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 209 (Tex.App.-Fort Worth 2004, pet. denied); *Capital Metro. Transp. Auth./Cent. of Tenn. Ry. & Navigation Co., Inc. v. Cent. of Tenn. Ry. & Navigation Co., Inc.*, 114 S.W.3d 573, 581–82 (Tex.App.-Austin 2003, pet. denied). In *Holt Atherton*, the appellees sued Holt Atherton for wrongfully refusing to repair a tractor pursuant to a warranty. 835 S.W.2d at 82. On appeal, Holt Atherton asserted that no evidence supported the trial court's award of lost profits. *Id.* at 83. The supreme court agreed, noting, among other problems with the evidence,

that the appellees did not identify which contracts were lost as a result of Holt Atherton's actions, how much profit they would have had from those contracts, or who would have awarded them contracts. *Id.* at 85. The supreme court summarized, "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits." *Id.*

The Austin court of appeals also found evidence of lost profits legally insufficient under circumstances similar to the *Holt Atherton* case. *Capital Metro.,* 114 S.W.3d at 581–82. In that case, the only evidence concerning lost profits came from appellee's expert, who relied on past reports concerning the rail line's performance and the owner's estimates concerning how many railcars he could have accommodated each year. *Id.* The court held that lost profits had not been proven to a reasonable certainty because the expert calculations were based on the owner's assertion of the number of contracts the line could have handled, which did not constitute reasonably certain objective evidence of lost profits without additional evidence of the reasonableness or reliability of the assumptions. *Id.* at 581. Similarly, here, the only testimony offered concerning lost profits came from Ferguson, who relied on the bare assumptions provided by Heck, without any other evidence to support the assumptions.

In *Atlas Copco,* the Fort Worth court of appeals found the evidence in support of lost profits legally insufficient. 131 S.W.3d at 209. The court's conclusion rested, in part, on the inclusion of "customers that appellee decided to stop selling to or relinquish, that were not part of appellee's territory under the agreement, and that refused to purchase appellant's product through appellee due to dissatisfaction with appellee's service." *Id.* at 208–09.

Similarly, here, the evidence shows a number of customers that ceased purchasing from, or reduced their purchases from, Air Starter based on their dissatisfaction with Air Starter.

In contrast, the Texas supreme court recently issued an opinion overturning a court of appeals' decision that the evidence of lost profits was legally insufficient. In *ERI Consulting,* ERI brought suit against Swinnea for statutory fraud, common law fraud, breach of a non-compete agreement, and breach of fiduciary duty. 318 S.W.3d at 871–72. Swinnea, a former partner in ERI, sold his interest to his partner and remained as an employee with a non-compete agreement. *Id.* at 870–71. However, Swinnea's wife formed a business that competed with one of ERI's clients. *Id.* The client informed ERI that it would no longer do business with ERI due to Swinnea's personal involvement with one of the client's competitors. *Id.* After a bench trial, the trial court awarded ERI $300,000 in lost profits. *Id.* at 876–77. The court of appeals reversed and rendered judgment in favor of Swinnea, finding the evidence of lost profits legally insufficient. *Id.* at 871–72.

The Texas supreme court held that the evidence was legally sufficient to support some ascertainable amount of lost profits, although the evidence did not prove the amount awarded by the trial court. *Id.* at 877–78. ERI presented 20 months of invoices showing the average revenue per month it made from the client before Swinnea's wrongdoing. *Id.* at 876–77. ERI also presented 33 months of invoices showing a significantly reduced monthly income from the client after Swinnea's wrongdoing. *Id.* Finally, ERI presented evidence of the profit margin on the revenue from that client. *Id.* Unlike the situation in *ERI Consulting,* Air Starter presented no evidence to show that it lost any particular

sales to Specialized due to Specialized's possession of Air Starter's customer list or to show the profit margin associated with any particular customer or any particular product.

This case more closely resembles *Holt Atherton, Atlas Copco,* and *Capital Metropolitan* than *ERI Consulting.* Ferguson assumed that 100 percent of Specialized's sales would have been made by Air Starter, without an objective basis to support that assumption. *Cf. Holt Atherton,* 835 S.W.2d at 85. Ferguson assumed Air Starter would have made sales for products or services not provided by Air Starter and to customers who had ceased buying from Air Starter for other reasons. *Cf. Atlas Copco,* 131 S.W.3d at 208–09. Ferguson based her lost profits on a margin provided by Heck that was an average of all of Air Starter's business, not the profit associated with the customers or products at issue in this case. *Cf. ERI Consulting,* 318 S.W.3d at 877–78. Ferguson did no independent work to verify the reasonableness or reliability of the assumptions provided by Heck, and no other evidence was offered in support of those assumptions. *Cf. Capital Metro.,* 114 S.W.3d at 581. No evidence from any source shows Air Starter lost any particular sales from the tortious interference with the Fuentes contract. *Cf. ERI Consulting,* 318 S.W.3d at 876–78. Ferguson did not provide a calculation for lost profits due to tortious interference, instead providing a calculation based on both the tortious interference and misappropriation claims. *Cf. ERI Consulting,* 318 S.W.3d at 878–79 (stating plaintiff has burden of "providing evidence supporting a single complete calculation of lost profits") (citing *Holt Atherton,* 835 S.W.2d at 85).

We hold that the evidence in this case is insufficient to show any amount of reasonably certain lost profits, based on objective facts, figures, or data, caused by the tortious interference with Fuentes's contract.

**E. Analysis of Lost Profits Due to Misappropriation of Trade Secrets**

■ The evidence of lost profits due to misappropriation of Air Starter's drawings fails for the same reasons that the evidence of lost profits due to the customer list fails. Additionally, Ferguson expressly stated she did not make a separate calculation based on misappropriation of Air Starter's drawings. She testified her calculations were based on Specialized having both the drawings and the customer list. Ferguson made no effort to perform a lost profit calculation based solely on misappropriation of Air Starter's drawings. Thus, there is not "one complete calculation" that is based on objective data showing with reasonable certainty Air Starter's lost profits due to the misappropriation of its drawings. *See Holt Atherton,* 835 S.W.2d at 84–85.

Air Starter contends that the expert testimony provided by the Glattly and Boyd parties provides some evidence of lost profits damages. However, the Glattly and Boyd parties' expert, James Bratic, specifically testified that, in his opinion, Ferguson's testimony concerning lost profits was flawed because she had relied solely on Heck's assumptions. He stated this was "unusual" for a certified public accountant charged with doing this type of work. Bratic also testified that, even if Ferguson's damages model was correct, she had overestimated lost profits. First, Bratic testified that Ferguson had included sales to customers that the evidence did not show had purchased from Air Starter in the past or who had ceased doing business with Air Starter for other reasons. Second, of the remaining sales, Bratic testified it was unreasonable to assume Air Starter would have made 100 percent of those sales. Rather, Bratic testified that

Ferguson should have used Air Starter's market share, which was approximately 40 to 50 percent, to determine the number of the sales Air Starter would have made. Applying these two reductions to Ferguson's damages model, Bratic testified the most Ferguson should have found in lost profits was $53,384 to $66,715 for Specialized and $32,948 to $41,185 for Global Pneumatics. Contrary to Air Starter's assertions, Bratic did not testify that Air Starter had been damaged, but conditionally testified that, if Ferguson's method was correct, she had failed to make appropriate reductions to her calculations. Bratic's testimony is no evidence of lost profits to Air Starter. Specifically, nothing in Bratic's testimony tends to prove the accuracy or reasonableness of the assumptions Ferguson used in calculating lost profits.

We sustain the Glattly parties' first issue and the Boyd parties' fourth issue. We therefore reverse that portion of the trial court's judgment awarding damages to Air Starter and render judgment that Air Starter take nothing on its claims for misappropriation of trade secrets and tortious interference. Because we sustain these issues and render a take-nothing judgment, we need not discuss the remaining issues raised by the Glattly and Boyd parties. *See, e.g., CenterPoint Energy Houston Elec. LLC v. Bluebonnet Drive, Ltd.*, 264 S.W.3d 381, 392 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (declining to reach remaining issues after determining first issue required reversal and rendition of take-nothing judgment).

### III. Air Starter's Appeal

Air Starter presents eight issues in its appeal, but the Glattly parties and the Boyd parties respond that Air Starter's entire appeal is waived.

### A. Waiver

As an initial matter, the Glattly parties and the Boyd parties contend that Air Starter has waived any error in the trial court's judgment by requesting the trial court enter judgment without noting its disagreement as to content. "Where a litigant moves the trial court to enter a judgment, and the trial court enters the judgment, the litigant cannot later complain of that judgment." *Casu v. Marathon Ref. Co.*, 896 S.W.2d 388, 389 (Tex. App.-Houston [1st Dist.] 1995, writ denied). To preserve the right to appeal a judgment, "a movant for judgment should state in its motion to enter judgment that it agrees only with the form of the judgment, and note its disagreement with the content and result of the judgment." *Id.* at 390 (citing *First Nat'l Bank of Beeville v. Fojtik*, 775 S.W.2d 632, 633 (Tex.1989)). However, "merely provid[ing] a draft judgment to conform to what the court had announced would be its judgment" does not result in waiver of the appeal. *John Masek Corp. v. Davis*, 848 S.W.2d 170, 174–75 (Tex.App.-Houston [1st Dist.] 1992, writ denied); *see also In re Bahn*, 13 S.W.3d 865, 875 (Tex.App.-Fort Worth 2000, orig. proceeding) ("A party should not be estopped from challenging a court's order when the party provides to the court a proposed order following what it believes was the court's ruling at the hearing, and the court signs it.").

Although the proposed judgment fails to note its disagreement as to the contents, Air Starter did not file a motion for entry of judgment. *Compare Casu*, 896 S.W.2d at 389 *with John Masek Corp.*, 848 S.W.2d at 174–75. Furthermore, a review of the record indicates that the proposed judgment that Air Starter circulated to the parties and the trial court was made after several hearings on post-trial motions and was intended to conform to what the trial court had announced as its judgment at

those hearings. Therefore, Air Starter has not waived its right to complain of the judgment. *See John Masek Corp.*, 848 S.W.2d at 174–75.

## B. Relitigation of Issues from Temporary Injunction

In its first issue, Air Starter contends that the trial court erred by construing the contract as a covenant not to compete instead of a non-disclosure agreement. Specifically, Air Starter asserts that the trial court erred because it enforced the contract as a non-disclosure agreement in the temporary injunction and, therefore, res judicata prevented the trial court from revisiting the issue. In its third issue, Air Starter asserts the trial court erred by "finding that the customer lists were not trade secrets" because the issue was determined in the temporary injunction proceeding.

### 1. Res Judicata

■■■ The doctrine of res judicata bars a second suit by parties on matters actually litigated in an earlier suit, as well as claims "which, through the exercise of diligence, could have been litigated in a prior suit." *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 799 (Tex.1992) (quoting *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 631 (Tex.1992)). For res judicata to apply, there must be: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims that were raised or could have been raised in the first action. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996).

It is undisputed that this is the first action brought between these parties. Thus, the first element is not met because there is no prior final judgment on the merits. Nor is the third element met because there is not a "second action" based

on the same claims as were raised in the "first action." Furthermore, Texas law is clear that, generally, a trial court's ruling on a temporary injunction (or other interlocutory judgment) does not support the defense of res judicata. *See Williams v. Houston Firemen's Relief and Ret. Fund*, 121 S.W.3d 415, 437 n. 21 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

■■■ Air Starter relies upon a case with an exception to the general rule. In *Brooks v. Jones*, the supreme court stated,

A corollary rule is aptly stated in [*Texaco Inc. v. Parker* ], 373 S.W.2d 870 (Tex. Civ.App.-El Paso 1963, writ ref'd n.r.e.), dealing with the choices of a losing litigant in a hearing on temporary injunction:

... A dissatisfied litigant has a choice— he may appeal or seek a trial on the merits. Having elected to appeal, he should thereafter be bound by matters fully litigated and determined in the same manner as appeals from final judgments.

In cases such as this, where the losing party elects not to pursue an appeal, but instead proceeds to the trial on the merits of a permanent injunction, such party will not be bound, under the doctrine of res judicata, by those issues decided in the prior hearing on the temporary injunction.

578 S.W.2d 669, 673 (Tex.1979). The exception in *Brooks* applies when (1) the parties elect distinctly to put in issue matters of law or fact, (2) they fully develop these matters before trial, (3) the trial court directly determines the matters, and (4) the parties appeal those matters so that their determination becomes final. *Towers v. Grogan*, No. 01–97–000946–CV, 1998 WL 191760, at *6 (Tex.App.-Houston [1st Dist.] Apr. 23, 1998, no pet.) (not designated for publication); *see also Brooks*, 578

S.W.2d at 673 (stating party appealing temporary injunction order "is bound by matters *fully litigated and determined*" (emphasis added)); *Visage v. Marshall*, 763 S.W.2d 17, 19 (Tex.App.-Tyler 1988, no writ) (stating exception in *Brooks* applies "[w]hen the denial of a temporary injunction follows a hearing *in which the merits of the issues raised were fully developed*" (emphasis added)); *Garza v. Mitchell*, 607 S.W.2d 593, 600 (Tex.Civ.App.-Tyler 1980, no writ) (stating exception in *Brooks* applies "[w]here the parties elect in a temporary injunction suit to put in issue a right or a question of fact ... and have it *directly determined* by the court" (emphasis added)).

 Here, the record before us does not support the application of *Brooks*. The prior proceeding was an application for a temporary injunction. To receive a temporary injunction, a party need not prove it will prevail on the merits; it must only show "a probable right to recovery." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). "The expression 'probable right to recover' is a term of art; it does not imply any kind of determination that becomes the law of the case...." *183/620 Group Joint Venture v. SPF Joint Venture*, 765 S.W.2d 901, 904 (Tex.App.-Austin 1989, writ dism'd w.o.j.). Our prior opinion notes that the proper standard of review for an order granting a temporary injunction does not include the merits of the case, but only whether the trial court abused its discretion in maintaining the status quo until the trial on the merits. *Molina*, 2004 WL 1277491, at *3. Accordingly, the exception articulated in *Brooks* does not apply. *See Visage*, 763 S.W.2d at 19 (stating exception in *Brooks* applies when merits of issues are fully developed). Our prior opinion does not indicate that the trial court made a final determination of the meaning of the contract and nothing in the opinion indicates this Court ad-dressed the issue of whether the agreement was a covenant not to compete or a non-disclosure agreement. *Molina*, 2004 WL 1277491, at *3. Similarly, nothing in our prior opinion indicates the trade-secret status of the customer list was finally determined. *Id.* Because the record does not show the issues of the proper construction of the contract or the status of the customer lists as trade secrets were before the trial court for final determination, that the issues were fully developed, or that the trial court directly and finally determined the issues, the exception *Brooks* does not apply. *See Towers*, 1998 WL 191760, at *6; *see also Sharma v. Vinmar Intern., Ltd.*, 231 S.W.3d 405, 424 (Tex.App.-Houston [14th Dist.] 2007, no pet.) ("The fact that a temporary injunction order was issued granting trade secret protection does not mean the protected information is a trade secret. That issue will be decided upon the trial on the merits.").

### 2. Invited Error

 Air Starter contends Specialized invited error by its conduct during the trial and appeal of the temporary injunction. Air Starter cites *Northeast Texas Motor Lines v. Hodges, Inc.*, 138 Tex. 280, 158 S.W.2d 487, 488 (1942). In that case, the supreme court stated that it is "elementary" that a party may not invite error by asking "something of a court and then complain that the court committed error in giving it to him." *Id.* In support of this argument, Air Starter relies on the same facts it asserted in its argument concerning res judicata. Nothing in the record indicates that the Glattly or Boyd parties asked for or received a ruling that the contract was a non-disclosure agreement. To the contrary, the trial court granted temporary injunctive relief *against* the Glattly and Boyd parties; it, therefore, appears that they were not given anything

by the trial court, asked for or not. Therefore, the invited error doctrine does not apply. *See id.; see also Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 862 (Tex.2005) (stating invited error doctrine is inapplicable because party did not ask for trial court ruling of which it complained on appeal).

### 3. Estoppel

 Air Starter also cites *Smith v. Chipley* for the proposition that the Glattly and Boyd parties should be estopped from asserting that the contract is a non-disclosure agreement because "a party will not be allowed in a subsequent judicial proceeding to take a position in conflict with a position taken by him in a former judicial proceeding." 118 Tex. 415, 16 S.W.2d 269, 276 (1929). The elements of equitable estoppel arising from inconsistent positions taken in judicial proceedings are (1) a party takes clearly inconsistent positions in the same or separate proceedings; (2) the position first asserted was successfully maintained or upheld; (3) the other party relied on the position first asserted; (4) adoption of the later position would result in injury or prejudice to the adverse party; and (5) where more than one action is involved, there is an identity of parties. *In re Estate of Loveless*, 64 S.W.3d 564, 577–78 (Tex.App.-Texarkana 2001, no pet.) (citing *Long v. Knox*, 155 Tex. 581, 291 S.W.2d 292 (1956); *Smith*, 16 S.W.2d at 275–76). The burden of proving these elements is on Air Starter. *See Santa Fe Petroleum, L.L.C. v. Star Canyon Corp.*, 156 S.W.3d 630, 640 (Tex.App.-Tyler 2004,

no pet.) ("The burden of proving an estoppel and the essential elements thereof rests on the party asserting it, and the failure to prove any one or more of the elements is fatal.") (citing *Barfield v. Howard M. Smith Co.*, 426 S.W.2d 834, 838 (Tex.1968)).

Here, as noted above, Air Starter has not provided this Court with a record showing the Boyd and Glattly parties raised positions that were "clearly inconsistent." Nor does Air Starter identify a ruling showing this inconsistent position was "maintained or upheld." Air Starter does not address the elements of "reliance" or "injury or prejudice." We hold Air Starter has not met its burden of proving each element of equitable estoppel. *See Santa Fe Petroleum*, 156 S.W.3d at 640.

We overrule Air Starter's first and third issues.[3]

### C. Construction of the Fuentes Contract

 In its second issue, Air Starter contends the trial court erred by construing the Fuentes contract as a covenant not to compete. Air Starter asserts that the contract's unambiguous language shows that it is a non-disclosure agreement. Although it has maintained that the Fuentes contract is a non-disclosure agreement, Air Starter has also consistently argued to the trial court and this Court that the contract prevents Fuentes from working as a salesman in the same field (air starters and air

---

3. In its reply brief, Air Starter raises "judicial estoppel" as an additional reason the trial court should not have revisited the construction of Fuentes contract. However, Air Starter did not raise this ground for reversing the trial court until its reply brief and it is therefore waived. *See McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) ("An

issue raised for the first time in a reply brief is ordinarily waived and need not be considered by this Court.") (citing *N.P. v. Methodist Hosp.*, 190 S.W.3d 217, 225 (Tex.App.-Houston [1st Dist.] 2006, pet. denied); *Lopez v. Montemayor*, 131 S.W.3d 54, 61 (Tex.App.-San Antonio 2003, pet. denied); *Zamarron v. Shinko Wire Co.*, 125 S.W.3d 132, 139 (Tex. App.-Houston [14th Dist.] 2003, pet. denied)).

starter components) in which he was employed by Air Starter. For example, in Air Starter's brief before this Court, Air Starter states, "Nowhere in the agreement does it state that Fuentes may not go to work for a competitor of [Air Starter's]. He could, but if he did so, he could not disclose the confidential information that he learned while in [Air Starter's] employment." Air Starter explains what it means by the second sentence in a footnote, stating, "Fuentes would have been free to work for Specialized in manufacturing or for Ingersoll–Rand selling air compressors." Similarly, when the trial court held post-trial hearings to construct the judgment in this case, Air Starter asserted, "We would ask that Mr. Fuentes, at the very least be permanently enjoined from selling to any of the companies that are shown on plaintiff's exhibit 156, preferably that he be enjoined permanently from selling air starters. . . ." Later during the same hearing, Air Starter argued,

> The question of can Mr. Fuentes go to Ingersoll Rand. I don't know that that is a good example to use because [Ingersoll Rand] is the granddaddy of the industry, but could he go to IR in sales. **Definitely he could go and sell a product that was not an air starter.** Could he go to ASAP, and I think ASAP is a better example because it deals in the after-market exclusively as does Air Starter Components. **And it would be our position that while he could go to work for them, he shouldn't be in sales.**

(Emphasis added). Thus, Air Starter has consistently maintained that the effect of the contract is to keep Fuentes from competing in the area of sales of air starter components. Because Air Starter has consistently requested the trial court and this Court to enjoin Fuentes from selling air starters and air starter components, we hold Air Starter cannot complain that the trial court erred by determining the Fuentes contract was a covenant not to compete. *See Ne. Tex. Motor Lines,* 158 S.W.2d at 488; *see also Tittizer,* 171 S.W.3d at 862 ("[A] party cannot complain on appeal that the trial court took a specific action that the complaining party requested, a doctrine commonly referred to as 'the invited error' doctrine.").

We overrule Air Starter's second issue.

## D. Texas Theft Liability Act

In its fourth issue, Air Starter contends it is entitled to attorney's fees under the Texas Theft Liability Act as a prevailing party, even thought the jury found no damages on the Texas Theft Liability Act claim. In the alternative, Air Starter asserts in its fifth issue that the jury's answers are inconsistent and should be construed as finding damages on the Texas Theft Liability Act claim.

### 1. Prevailing Party

Air Starter contends that it was entitled to attorney's fees as a prevailing party under the Texas Theft Liability Act, even though the jury found no damages for the violation of that statute. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 134.001–.005 (Vernon 2005). The Texas Theft Liability Act provides civil liability for certain acts proscribed by the Texas Penal Code, including unlawfully appropriating a trade secret. *See id.* § 134.002(2); *IBP, Inc. v. Klumpe,* 101 S.W.3d 461, 472 (Tex.App.-Amarillo 2001, pet. denied). The Texas Theft Liability Act provides that a person "who commits theft is liable for the damages resulting from the theft." TEX. CIV. PRAC. & REM.CODE ANN. § 134.003(a). In addition, under the Texas Theft Liability Act a person "who has sustained damages" may recover the amount of actual damages found by the trier of

fact.[4] *Id.* § 134.005(a)(1). Finally, a "person who prevails" in a suit under the Act "shall be awarded court costs and reasonable and necessary attorney's fees." *Id.* § 134.005(b). However, the Act does not define a "person who prevails." *See id.*

Air Starter contends that it prevailed because the jury found a violation of the Texas Theft Liability Act, even though the jury answered "0" on the damages question. The Texas supreme court recently addressed the issue of what it means to be a prevailing party. In *Intercontinental Group Partnership v. KB Home Lone Star L.P.*, the supreme court stated that a party was not a prevailing party on a breach of contract claim when the jury found a breach of contract but answered "0" for damages. 295 S.W.3d 650, 654–55 (Tex. 2009). In *Intercontinental*, the issue was a contract that provided for attorney's fees for the prevailing party but did not define prevailing party. *Id.* at 653–54. The supreme court noted the ordinary meaning of prevailing party should be used. *Id.* The supreme court held that a party that did not receive damages or other relief on its claim could not be a prevailing party. *Id.* at 655–56. Because the jury found no damages for the violations of the Texas Theft Liability Act, we hold that Air Starter was not a prevailing party. *See id.*

Air Starter also asserts in its reply brief that it received injunctive relief and, thus, should be considered a prevailing party. However, Air Starter did not raise this ground for reversing the trial court until its reply brief; it is, therefore, waived. *McAlester Fuel Co. v. Smith Int'l, Inc.*, 257 S.W.3d 732, 737 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (citing *N.P. v. Methodist Hosp.*, 190 S.W.3d 217, 225 (Tex.App.-Houston [1st Dist.] 2006, pet.

denied); *López v. Montemayor*, 131 S.W.3d 54, 61 (Tex.App.-San Antonio 2003, pet. denied); *Zamarron v. Shinko Wire Co.*, 125 S.W.3d 132, 139 (Tex.App.-Houston [14th Dist.] 2003, pet. denied)). Even if we reached the issue, we note that the Texas Theft Liability Act does not authorize injunctive relief. It provides only that a person "who has sustained damages" may recover the amount of actual damages found by the trier of fact. TEX. CIV. PRAC. & REM.CODE ANN. § 134.005(a)(1). The only relief provided for by the Theft Liability Act is actual damages and that is the only relief Air Starter requested from the jury, which the jury denied by finding "0" for actual damages. *See Hawkins v. Walker*, 233 S.W.3d 380, 400 & n. 73 (Tex.App.-Fort Worth 2007, no pet.) (stating, "[C]ourts have construed this phrase ['prevailing party'] to mean that the party must recover at least some of the relief sought by its claim.").

Air Starter cites to a prior case from this Court that held an award of zero damages did not preclude attorney's fees as the prevailing party under the Texas Theft Liability Act. *See Johns v. Ram–Forwarding, Inc.*, 29 S.W.3d 635, 638 (Tex. App.-Houston [1st Dist.] 2000, no pet.). In that case, we stated, "[W]e hold that Ram–Forwarding was entitled to recover attorney's fees even though it recovered zero damages for its civil theft claim." *Id.* However, the reasoning this Court employed was that a party could "prevail" without recovering damages. *Id.* Given the supreme court's holding in *Intercontinental* that a party who does not receive any relief on its claim cannot be the prevailing party under the ordinary meaning of that term, this Court's prior opinion is no longer a correct statement of the law

---

**4.** The Texas Theft Liability Act also provides for additional "damages awarded by the trier of fact in a sum not to exceed $1,000...."

TEX. CIV. PRAC. & REM.CODE ANN. § 134.005(a)(1) (Vernon 2005). However, additional damages are not an issue in this case.

concerning "prevailing party." We therefore decline to follow *Johns* to the extent it has been implicitly overruled by the supreme court's decision in *Intercontinental.* See *Intercontinental,* 295 S.W.3d at 654–55 (holding jury's finding of liability on party's claim does not bestow "prevailing party" status when party received no relief on that claim).

We overrule Air Starter's fourth issue.

### 2. Inconsistent Jury Answers

In the alternative, Air Starter asserts in its fifth issue that the jury's answers conflict and this Court should reconcile the jury's answers to "supply the damages . . . to support an award of attorney's fees" under the Texas Theft Liability Act. To preserve error that the jury's findings are inconsistent, the complaining party must raise an objection in the trial court before the jury is discharged. *Oyster Creek Fin. Corp. v. Richwood Inv. II, Inc.,* 176 S.W.3d 307, 324 (Tex.App.-Houston [1st Dist.] 2004, pet. denied); *see also Kennedy Ship & Repair, L.P. v. Pham,* 210 S.W.3d 11, 24 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

After receiving the jury's verdict, the trial court asked, "Is there any other matter we need to take up before I release this jury?" Air Starter's counsel answered "Not that I'm aware of at this time." The other attorneys present answered, "Not that I'm aware of, Your Honor," or, "No, Your Honor." The trial court stated, "There being none I will proceed to release the jury." After thanking the jury, the trial court told the jury, "You are excused and released." Because Air Starter did not raise an objection to an inconsistency or conflict before the trial court discharged the jury, it has not preserved that issue for appeal. *See Oyster Creek,* 176 S.W.3d at 324; *see also Kennedy Ship & Repair,* 210 S.W.3d at 24.

We overrule Air Starter's fifth issue.

### E. Injunction

In its sixth issue, Air Starter contends the trial court erred by enjoining Specialized, Molina, and Glattly from using Air Starter's drawings for a period of 30 years instead of enjoining them permanently. Specifically, at the conclusion of this section of its argument, Air Starter states that the trial court erred by not enjoining "[Specialized], Boyd, Molina, Glattly, and Fuentes, *permanently,* from manufacturing any of the parts manufactured by [Air Starter]." (Emphasis in original.) Similarly, in its prayer, Air Starter asks for "[e]ntry of a permanent injunction against Fuentes, Molina, Boyd, Glattly, and [Specialized] from manufacturing any parts that compete with those that Air Starter manufactures."

The decision to grant or deny a permanent injunction is ordinarily within the sound discretion of the trial court, and appellate review of the trial court's action is limited to the question of whether such action constituted a clear abuse of discretion. *Butler v. Arrow Mirror & Glass, Inc.,* 51 S.W.3d 787, 791 (Tex.App.-Houston [1st Dist.] 2001, no pet.). An abuse of discretion occurs if the trial court acts arbitrarily and unreasonably, without reference to guiding rules or principles, or misapplies the law to the established facts of the case. *Id.* An abuse of discretion does not exist if the trial court heard conflicting evidence, and evidence appears in the record that reasonably supports the trial court's decision. *Id.* at 792. We may not substitute our judgment for that of the trial court. *Id.*

Here, the trial court entered an injunction against Glattly, Molina, and Specialized, stating they "are ENJOINED for a period of thirty (30) years from the date of this judgment, from using any of the infor-

mation contained on or in the physical drawings and AutoCAD drawings (of the air starters that Air Starter Components, Inc., manufactures) to manufacture competing air starters."

## 1. Length of the Injunction

 Air Starter contends the trial court erred by limiting the length of the injunction to 30 years instead of making it permanent. Air Starter asserts that, because the drawings were stolen, Air Starter's rights remain superior to those of Glattly, Molina, and Specialized. Air Starter also asserts that the trial court's order essentially gives Glattly, Molina, and Specialized title to the stolen drawings after 30 years, but that "no one ever acquires title to stolen property through the passage of time." In their appellees' brief, the Glattly parties reply that the trial court did not abuse its discretion because the prohibition on improperly using Air Starter's trade secrets "does nothing more than the law already does in prohibiting a party from using someone else's trade secrets." As the Glattly parties acknowledge, "[t]hat prohibition exists even without the injunction and will continue to exist thirty years from now."

The Texas supreme court has affirmed a permanent injunction to prevent the improper use of trade secrets. *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782, 790 (1958). Because the supreme court has affirmed the use of a permanent injunction and the Glattly parties acknowledge they are prohibited from ever using Air Starter's drawings, we conclude the trial court erred by limiting the injunction to 30 years.

We sustain this portion of Air Starter's sixth issue.

## 2. Scope of the Injunction

 Within its sixth issue, Air Starter contends the trial court erred by limiting the scope of the injunction to use of trade secrets without including the manufacture of competing parts, and by failing to enjoin Boyd and Fuentes.

 By seeking an order that prohibits any competition by "manufacturing any parts that compete with those that Air Starter manufactures," Air Starter's requested injunction seeks more protection than the law's prohibition on the use of trade secrets. *See Sharma*, 231 S.W.3d at 424. Here, the jury found that Air Starter's drawings were trade secrets. Trade secrets are entitled to protection; the law "forbids an employee from using trade secret information acquired during the employment relationship in a manner adverse to the employer." *Id.* Because the jury's findings, therefore, concern trade secrets only, the trial court did not abuse its discretion by failing to prohibit competition with Air Starter. Furthermore, the jury found that Glattly, Molina, and Specialized had misappropriated trade secrets, but it did not make the same finding concerning Boyd and Fuentes, and Air Starter has not challenged this jury finding on appeal. There is no jury finding of misappropriation of trade secrets against Boyd and Fuentes, the parties Air Starter seeks to enjoin in this appeal. We hold that the trial court properly did not enjoin Boyd and Fuentes, as the jury made no findings that they had misappropriated trade secrets.

We overrule this portion of Air Starter's sixth issue.

## F. Attorney's Fees

In its seventh issue, Air Starter contends the trial court erred by refusing to award attorney's fees.

Air Starter contends that, under Texas common law, a party may recover its attorney's fees under a contract if the contract so provides. The Fuentes contract states, "[Air Starter] will also be entitled to recover reasonable attorney's fees, expert fees and costs in any action which it brings against [Fuentes] to enforce its rights under this Agreement." As noted earlier in this opinion, Air Starter asked the trial court to prevent Fuentes from competing against Air Starter and the trial court granted that request. We address whether Air Starter, the employer, may recover its attorneys to enforce a covenant not to compete against Fuentes, its employee.

## 1. Applicable Law

Section 15.50 of the Covenants Not to Compete Act provides the criteria for enforceability of covenants not to compete. TEX. BUS. & COM.CODE ANN. § 15.50 (Vernon Supp.2009). These criteria, which are not at issue in this appeal, include that the covenant must (1) be ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) contain limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promise (i.e., the employer). *Id.*; *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 643 (Tex.1994), *holding modified by Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d, 644 (Tex. 2006). Section 15.51, entitled "Procedures and Remedies in Actions to Enforce Covenants not to Compete," provides, in pertinent part,

If the covenant ... contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable and impose a greater restraint than is necessary to protect the goodwill or other business interest of the

[employer], the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable and to impose a restraint that is not greater than necessary to protect the goodwill or other business interest of the [employer] and enforce the covenant as reformed, except that the court may not award the [employer] damages for a breach of the covenant before its reformation and the relief granted to the [employer] shall be limited to injunctive relief.

TEX. BUS. & COM.CODE ANN. § 15.51(c) (Vernon 2002). The second sentence of 15.51(c) also provides that a court "may" award attorney's fees "incurred by the [employee] defending the action to enforce the covenant," if the employee proves that (1) the employer knew the restrictions in the covenant were unreasonable at the time of the execution of the agreement and (2) the employer sought to enforce the covenant "to a greater extent than was necessary to protect the goodwill or other business interest of the [employer]." *Id.* Section 15.52, entitled "Preemption of Other Law," provides,

[T]he procedures and remedies in an action to enforce a covenant not to compete provided by Section 15.51 of this code are exclusive and preempt any other ... procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise.

TEX. BUS. & COM.CODE ANN. § 15.52 (Vernon 2002). The San Antonio court of appeals has specifically stated that "section 15.52 preempts an award of [attorney's] fees under any other law." *Perez v. Tex. Disposal Sys., Inc.*, 103 S.W.3d 591, 594 (Tex. App.-San Antonio 2003, pet. denied); *see also Light*, 883 S.W.2d at 644 (noting Covenants Not to Compete Act intended "to

largely supplant the Texas common law relating to enforcement of covenants not to compete" and thus courts apply the Act "in lieu of 'any other ... procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise' ").

## 2. Analysis

 Here, this case involves "an action to enforce a covenant not to compete." Thus, the Covenants Not to Compete Act applies and preempts "any other ... procedures and remedies," including the common law. TEX. BUS. & COM.CODE ANN. § 15.52; *Light*, 883 S.W.2d at 644. Section 15.51(c) only provides for an award of attorney's fees to an employee in limited circumstances; it makes no provision for an award of fees to an employer. TEX. BUS. & COM.CODE ANN. § 15.51(c). Because the Covenants Not to Compete Act preempts all other procedures and remedies, it "preempts an award of [attorney's] fees under any other law." *Perez*, 103 S.W.3d at 594. This includes the common law that a party may recover attorney's fees if provide for by contract. *See* TEX. BUS. & COM.CODE ANN. § 15.52; *Light*, 883 S.W.2d at 644; *Perez*, 103 S.W.3d at 594. We hold that the trial court properly denied Air Starter's requests for attorney's fees because the Covenants Not to Compete Act does not permit employers to recover their attorney's in suits to enforce their rights under the Act. *See Perez*, 103 S.W.3d at 594.

We overrule Air Starter's seventh issue.

## G. Discovery of Computer Hard Drives

In its eighth issue, Air Starter contends the trial court erred by denying its motion to compel production of an un-redacted copy of the hard drives of Specialized's computers. Specifically, Air Starter contends Specialized should not be able to rely on the attorney-client privilege because Specialized's possession of the drawings on the hard drives was an ongoing crime or fraud.

 If the trial court errs in making a discovery ruling, the complaining party must still show harm on appeal. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex.2009) (citing TEX.R.APP. P. 44.1(a)). Harmful error is error that "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." *Id.* (quoting TEX.R.APP. P. 44.1(a)). Here, Air Starter identifies no harm that it suffered as a result of the trial court's decision to deny discovery of Specialized's hard drives. Accordingly, we overrule Air Starter's eighth issue. *See id.;* TEX.R.APP. P. 44.1(a); *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995) (noting successful challenge to evidentiary rulings usually requires complaining party to show that judgment turns on particular evidence excluded or admitted).

## Conclusion

We reverse that portion of the trial court's judgment awarding damages to Air Starter and render judgment that Air Starter take nothing in its claim for damages. We also modify that portion of the trial court's judgment enjoining Specialized, Glattly, and Molina from using Air Starter's trade secrets for a period of 30 years by removing the time restriction from the injunction. As modified, we affirm the remainder of the judgment.