**Opinion issued June 6, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00220-CV

———————————

**CHCA WOMAN'S HOSPITAL, L.P. D/B/A WOMAN'S HOSPITAL OF TEXAS, Appellant**

**V.**

**NEMA UWAYDAH, M.D., Appellee**

---

**On Appeal from County Civil Court at Law No. 1**
**Harris County, Texas**
**Trial Court Case No. 1086687**

---

## MEMORANDUM OPINION

Appellant CHCA Woman's Hospital, L.P. d/b/a Woman's Hospital of Texas (the Hospital) is appealing the trial court's judgment in favor of appellee Dr. Nema Uwaydah (Dr. Uwaydah) rendered after a bench trial. In three issues, the Hospital argues that: (1) the trial court erred by rendering a take-nothing judgment against it

on its breach of contract claim against Dr. Uwaydah because the Hospital established that it was entitled to judgment on its claim as a matter of law, and there is legally and factually insufficient evidence supporting the trial court's findings; (2) the trial court erred by rendering judgment in Dr. Uwaydah's favor on her claim for wrongful eviction, and there is legally and factually insufficient evidence supporting the trial court's findings; (3) the trial court erred by rendering judgment in Dr. Uwaydah's favor on her negligence claim, and there is legally and factually insufficient evidence supporting the trial court's findings; and (4) the trial court erred by awarding Dr. Uwaydah her attorney's fees based on her wrongful eviction claim.

We reverse the take-nothing judgment rendered against the Hospital on its breach of contract claim and render judgment in the Hospital's favor in the amount of $34,109.12. We remand the issue of the Hospital's attorney's fees for new trial.

We reverse the trial court's judgment on Dr. Uwaydah's wrongful eviction and negligence claims and render a take-nothing judgment against Dr. Uwaydah on both claims. Because Dr. Uwaydah's award of attorney's fees is predicated on her wrongful eviction claim, we reverse that award as well and render a take nothing judgment against Dr. Uwaydah on her claim for such fees.

2

**Background**

**A.      Breach of Contract and Wrongful Eviction**

Dr. Uwaydah is a family practitioner who opened her private practice in one of the medical office buildings located on the campus of Texas Woman's Hospital in 2002. She alleges that she initially leased her office space from the Hospital. One and a half years later, Dr. Uwaydah moved her practice to the second floor of a different building on the same campus (the Premises). On August 6, 2004, Dr. Uwaydah executed a lease, as amended, by and between MOB 103 of Texas, L.P., as landlord, and Dr. Uwaydah, as tenant, for the Premises. According to Dr. Uwaydah, she believed that both buildings were owned by the Hospital's parent company, HCA. She executed several subsequent leases with MOB 103, as landlord.

On or about May 15, 2014, Dr. Uwaydah's daughter became seriously ill and required extensive hospitalization and around-the-clock care. Dr. Uwaydah discontinued her medical practice for three months beginning in May 2014 and was in and out of her office for the remainder of the year. She was also out of the office for several extended periods in 2015 and 2016. Dr. Uwaydah testified that although she was late paying her rent several times, her landlord, MOB 103, accepted the late payments, waived any late fees, and did not evict her.

On or about February 23, 2015, Dr. Uwaydah executed a First Amendment to Base Year Medical Office Building Lease, as tenant, with MOB 103, as landlord

3

(the Lease), for the Premises. The Lease was for a term of three years, beginning on April 1, 2015 and ending on March 31, 2018.

On January 15, 2016, the Hospital purchased the building at 7580 Fannin from MOB 103.

At MOB 103's request, Dr. Uwaydah executed a "Tenant Estoppel" letter on April 21, 2016 ratifying the Lease.[1] Dr. Uwaydah attested to the following facts in her letter:

> . . . The Lease is in full force and effect and is the valid and binding obligation of Tenant.
>
> As of the date hereof, to the best of Tenant's Knowledge, Landlord has performed all of its obligations under the Lease and neither Tenant nor, to the best of Tenant's knowledge, Landlord, is currently in default under the Lease and, to the best of Tenant's knowledge, no event has occurred which with the giving of notice or passage of time would constitute such a default.

---

[1] Section 18.1 of the Lease states:

> Within ten (10) days following receipt of Landlord's written request, Tenant shall deliver, executed in recordable form, a declaration to any person designated by Landlord: (a) ratifying this Lease; (b) stating the commencement and termination dates of the Lease; and (c) certifying (i) that this Lease is in full force and effect and has not been assigned, modified, supplemented or amended (except by such writings as shall be stated); (ii) that all conditions under this Lease to be performed by Landlord have been satisfied (stating exceptions, if any); (iii) that no defenses, credits or offsets against the enforcement of this Lease by Landlord exist (or stating those claimed); (iv) the sum of advance Rent, if any, paid by Tenant; (v) the date to which Rent has been paid; (vi) the amount of security deposited with Landlord; and (vii) such other information as Landlord reasonably requires. Persons receiving such statements of Tenant shall be entitled to rely upon them.

The Lease has not been modified, altered or amended (in writing or orally), except as provided above.

As of the date hereof, there are no off-sets, defenses, counterclaims or credits against rentals, nor have rentals been prepaid for more than one (1) month in advance.

. . . .

As of the date hereof, all base rental and other payments due under the Lease are current, with the amount of base rental and other payments paid by Tenant, for operating expenses, being $4,887.23. There are no free rental, rebates or other concessions due to Tenant under the Lease.

On April 29, 2016, MOB 103 assigned all the leases in the building, including Dr. Uwaydah's lease, to the Hospital. On that day, Dr. Uwaydah's account had a positive balance of $325.81 and the $4,500.00 security deposit she had paid to MOB 103 was transferred to the Hospital. The same management company that represented MOB 103 continued to manage the Premises for the Hospital.

On September 28, 2016, the Hospital sent Dr. Uwaydah a Notice to Vacate informing her that she had defaulted on the Lease by failing to pay rent for May thru September 2016. The Hospital terminated her right to possession under the Lease but not her liability to pay rent accruing under the Lease, including her liability for past due rent. She was given three days to vacate the Premises.

Dr. Uwaydah did not vacate. The Hospital filed a forcible detainer action in the justice court. On August 25, 2016, the justice court determined that the Hospital

had a superior right to possession of the Premises, entered judgment in the Hospital's favor, and ordered a writ of possession to issue on November 1, 2016.

Dr. Uwaydah attempted to negotiate with the Hospital for an extension of time to relocate her practice. After the parties were unable to reach an agreement regarding an extension, Dr. Uwaydah packed up her office and moved her belongings into a storage unit. Dr. Uwaydah testified that she began moving out of her office on October 31, 2016, and that she was "done, I think, on the 1st" of November. The Hospital's property manager confirmed that Dr. Uwaydah vacated the Premises on November 1, 2016. Dr. Uwaydah testified that she had difficulty finding another suitable location and she was not able to resume her medical practice until the end of April 2017.

In December 2016, the Hospital sued Dr. Uwaydah for breach of the Lease. Dr. Uwaydah filed a general denial and raised several affirmative defenses including estoppel and waiver. Dr. Uwaydah later added counterclaims against the Hospital for "wrongful eviction" and requested attorney's fees. She also alleged that she lost patients and income because the Hospital's switchboard personnel falsely and negligently told some of her patients who were trying to contact her that she was no longer practicing medicine in the Premises.

6

## B.     The Lease

Under the terms of the Lease, Dr. Uwaydah was required to pay the Hospital $4,719.06 a month from April 2016 to March 2017 (Base Rent). Base Rent was due on the first day of each calendar month. The Lease further provides that Dr. Uwaydah was required to pay "additional rent" each month. The Additional Rent required by the Lease includes Dr. Uwaydah's proportionate share of "excess operating costs," which includes costs for maintaining the office building's common areas. "Base Rent" and "Additional Rent" are collectively referred to as "Rent" for purposes of the Lease. Dr. Uwaydah judicially admitted that she was obligated to pay $4,887.23 in Rent every month, as of April 2016.

The Lease also allows the Hospital to collect late fees from Dr. Uwaydah if she does not pay her Base Rent or Additional Rent within ten days of the due date (the Late Payment Date). Specifically, section 20.3 states that if Dr. Uwaydah does not pay her Base Rent or Additional Rent within ten days of the due date, Dr. Uwaydah "shall, upon demand, pay Landlord a late charge . . . ." The Hospital is also entitled to collect additional late charges if Dr. Uwaydah did not pay her Base Rent or Additional Rent within thirty days after the Late Payment Date. Dr. Uwaydah's failure to pay Rent or to make any other payment required under the Lease within ten days after the payment is due constitutes a material default and breach of the Lease.

Section 13, which identifies the remedies available to the Hospital in the event Dr. Uwaydah defaulted on the Lease, states that the Hospital may continue the Lease in full force and effect and continue to collect Rent from Dr. Uwaydah until the Hospital can lease the property to a third party. Under such circumstances, the Lease will only be terminated if the Hospital notifies Dr. Uwaydah in writing that the Hospital has elected to terminate the Lease. Section 13.1(b) also allows the Hospital to terminate the Lease and reacquire possession of the Premises if Dr. Uwaydah defaults. Under such circumstances, the Hospital "shall have the right to collect an amount equal to all expenses incurred by Landlord in recovering possession of the Premises, including but not limited to reasonable attorneys' fees and costs; all reasonable costs and charges for the care of the Premises while vacant; all renovation costs incurred in connection with the preparation of the Premises for a new tenant; all past due Rent which is unpaid, plus interest thereon at the Interest Rate (as defined in Section 20.9); and the amount of Rent that would have been due for the remainder of the Term if the Lease had continued until the expiration of the Term." "All rights, options and remedies of [the Hospital] provided herein or elsewhere by law or in equity shall be deemed cumulative and not exclusive of one another."

The Lease also contains a nonwaiver clause (the Nonwaiver Clause). Section 20.6 provides that:

> [N]o waiver by Landlord or Tenant of any breach of any term, agreement, covenant, or condition of this Lease shall be deemed to be

8

a waiver of any other term, agreement, covenant, or condition hereof or of any subsequent breach by Landlord or Tenant for the same or any other term, agreement, covenant, or condition. . . . The subsequent acceptance of Rent shall not be deemed a waiver of any preceding breach by Tenant of any agreement, covenant or obligation of Tenant or any other term or condition of this Lease.

In addition to the nonwaiver clause, the Lease further states that, "No provision of this Lease may be amended or added to except by an agreement in writing signed by the parties hereto or their respective successors in interest."

## C.    Deemed Admissions

The Hospital served Dr. Uwaydah with discovery, including a request for admissions. Because Dr. Uwaydah did not respond to the admissions requests within thirty days, the matters in the requests are deemed admitted against her without the necessity of a court order. *See* TEX. R. CIV. P. 198.2(c); *Marino v. King*, 355 S.W.3d 629, 633 (Tex. 2011) (per curiam). As a result, Dr. Uwaydah judicially admitted the following matters:

[The Hospital] performed all of its contractual obligations required by the Lease.

[Dr. Uwaydah] did not perform all of [her] obligations required by the Lease.

Neither of the parties modified the Lease.

The last time [Dr. Uwaydah was] current on Rent was on April 30, 2016.

[Dr. Uwaydah has] not paid Rent for May, June, July, August, September, October or November of 2016.

9

**D.    Dr. Uwaydah's Negligence Claim**

Dr. Uwaydah contends that she lost patients and income because the Hospital's switchboard personnel falsely and negligently told some of her patients who were trying to contact her that she was no longer practicing medicine in the Premises.

Dr. Uwaydah testified that her telephone service was disrupted in 2016 and she attributed the problem to ongoing construction at the Hospital. According to Dr. Uwaydah, other tenants in her building experienced similar problems. One of the hospital's switchboard operators testified, that on one occasion in 2016, Dr. Uwaydah's entire office building lost phone service. According to the operator, Dr. Uwaydah's patients continued having problems contacting her even after service was restored to the building. On different occasions, two Hospital telephone operators, one of whom was a current patient of Dr. Uwaydah, met with Dr. Uwaydah and took down Dr. Uwaydah's cell phone number and posted that number in the operator's office to be provided to patients who called the Hospital. There were continued patient complaints that the patients could not reach Dr. Uwaydah by her cell phone, that her phone's mailbox was full, or that Dr. Uwaydah was not returning calls, so the operators met with Dr. Uwaydah again and Dr. Uwaydah asked that the operators tell patients to text her cell phone.

Two patients testified they called the Hospital in August or September 2016 and were told that Dr. Uwaydah was no longer practicing in the Premises. Both witnesses also testified that they subsequently found Dr. Uwaydah in her office, they were treated by Dr. Uwaydah, and they paid her for the services. No witnesses testified that they received incorrect information from the Hospital regarding Dr. Uwaydah prior to August 2016 or after September 2016.

Dr. Uwaydah testified that she believed that her practice was reduced from May through October 2016 because the Hospital's switchboard operators were telling her patients that she was no longer in the building. She testified to a rough estimate of decline in business of $4,000 for June 2016, $6,000 for July and August 2016, and $8,000 for September and October 2016. Dr. Uwaydah testified that she based her estimates "on previous summers, previous months. We do have up-and-down months, so based on that time of the year compared to previous times. So I was basing it off of those numbers. And also the reason that I thought that the decline was, you know, due to this was especially due to the fact of the problems with the construction affecting the phone lines as well as the misinformation to the patients." Dr. Uwaydah explained that she increased the amount of lost revenue during the summer months because she "had more people walking into [her] office telling [her] directly that they were coming to check on [her] because they were told that [she] was not there."

11

## E. Judgment and Findings of Fact and Conclusions of Law

After a bench trial, the trial court ordered that Dr. Uwaydah was entitled to recover from the Hospital $67,176.62 in actual damages and $12,000 in attorney's fees, and it rendered a take-nothing judgment against the Hospital on its breach of contract claim against Dr. Uwaydah.

The trial court also issued findings of fact and conclusions of law in support of its judgment. With respect to her wrongful eviction claim, the trial court found that Dr. Uwaydah had entered into several other leases with MOB 103, as landlord, prior to February 23, 2015, the date the Lease was executed (the MOB Leases). The court also found that Dr. Uwaydah had previously entered into a lease with the Hospital, as landlord, for office space located in the same medical office (the Prior Hospital Lease), and that both MOB 103 and the Hospital used the same management company. The court also found that although Dr. Uwaydah was late paying rent several times under the MOB Leases and the Prior Hospital Lease, she was allowed to make late payments without paying late fees and without being threatened with eviction.[2] The trial court concluded that because the Hospital had "waived late fees and [Dr.] Uwaydah was not evicted when [she] brought the account current," the Hospital "waived its right to assert payment of late fees and/or evict

---

[2] The court also found that Dr. Uwaydah was not able to make any monthly payments after May 1, 2016 "because of difficulties arising out of her daughter's health."

[Dr.] Uwaydah . . ., when [Dr.] Uwaydah was ready, willing and offered to bring her account current in October 2016" and was liable for wrongfully evicting Dr. Uwaydah. The trial court found that Dr. Uwaydah was entitled to recover $60,000 from the Hospital for wrongful eviction.

With respect to her negligence claim, the trial court found, among other things, that Dr. Uwaydah "lost patients and suffered damages for lost income in the amount of $32,000.00 from June 2016 to October 2016" and awarded her $32,000 on her negligence claim.

Despite rendering a take-nothing judgment against the Hospital on its breach of contract claim, the court found that the Hospital was "entitled to a credit in the amount of $24,823.38, for the amount remaining unpaid on the Lease and owed by Uwaydah to [the Hospital]."

### Standard of Review and Applicable Law

We review the trial court's conclusions of law de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). "When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual sufficiency of the evidence supporting them." *Hertz Equip. Rental Corp. v. Barousse*, 365 S.W.3d 46, 53 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

When conducting a legal sufficiency review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id.* at 827. We must determine whether the evidence at trial would enable a reasonable and fair-minded factfinder to find the facts at issue. *See id.*

When attacking the legal sufficiency of the evidence to support an adverse finding on an issue for which it had the burden of proof, an appellant must demonstrate that the evidence conclusively established all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)); *Duran v. Garcia*, 224 S.W.3d 309, 312 (Tex. App.—El Paso 2005, no pet.). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. *Sterner*, 767 S.W.2d at 690. First, the record must be examined for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* Second, if there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.* The legal sufficiency challenge will be sustained only if the contrary position is conclusively established. *Duran*, 224 S.W.3d at 312–13. A party that challenges the legal sufficiency of a

14

finding on which it did not have the burden of proof must show that no evidence supports the jury's finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

When reviewing a challenge to the factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

We defer to the factfinder's determination of the credibility of the witnesses and the weight to accord their testimony. *City of Keller*, 168 S.W.3d at 819. The factfinder is the only judge of witness credibility and the weight to give to testimony and we defer to the factfinder's resolution of these issues when conducting both legal and factual sufficiency reviews. *See id*.

"We apply well-established rules of contract interpretation when construing the Lease Agreement." *Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). "Specifically, when construing a written contract, our primary concern is to ascertain the true intent of the parties as expressed in the

instrument." *Id.* "If the written instrument is so worded that it can be given a definite or certain legal meaning, then the contract may be construed as a matter of law." *Id.*

## Waiver

Because the resolution of the Hospital's first and second issues (breach of contract and wrongful eviction) turns, in part, on Dr. Uwaydah's waiver argument, we will address waiver first.[3]

Although she admits that the Hospital is entitled to recover some amount of damages on its breach of contract claim, and therefore, she concedes that the Hospital prevailed on its claim, Dr. Uwaydah argues that the Hospital cannot recover any outstanding late fees as damages because the Hospital waived its right to recover such fees by accepting late rent payments without charging late fees. She further contends that she was wrongfully evicted because the Hospital "pursued an eviction remedy that it had expressly waived through past conduct when it accepted late payments and did not pursue an eviction."

Dr. Uwaydah contends that the Hospital accepted late rent payments from her that were due under a pre-2004 lease without charging her late fees or evicting her. However, there is no evidence that the Hospital, as opposed to the previous owner,

---

[3] Although Dr. Uwaydah argued to the trial court that the Hospital was estopped from requiring payment of late fees and/or from evicting her, and the trial court issued findings of fact and conclusions of law supporting her estoppel argument, Dr. Uwaydah does not present this argument on appeal, and has focused only on the issue of waiver.

MOB 103, accepted late rent payments from Dr. Uwaydah that were due under the 2015 Lease, ratified by Dr. Uwaydah, after it purchased the Premises.

Dr. Uwaydah has not presented any evidence that the Hospital accepted a late payment of Rent on or after April 29, 2016, when it became the landlord under the Lease and, therefore, was in position to assert any rights under the Lease. *See Tri-Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 451–52 (Tex. App.—Fort Worth 2005, pet. denied) (excluding evidence of waiver that occurred during prior lease as to original landlord and excluding evidence of waiver that occurred prior to current landlord's acquisition of property against current landlord); *see generally Segal v. Emmes Capital, L.L.C.*, 155 S.W.3d 267, 281 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd) ("To waive a right impliedly, by acting inconsistently with it or by not acting at all, the right must be assertable at the time that the right is waived.").

Furthermore, the Lease contains an unambiguous integration clause that states that the Lease, including the exhibits and amendments attached to the Lease, "contains all of the agreements of the parties hereto with respect to any matter covered or mentioned in this Lease, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose." The purpose of an integration clause is to trigger the parol evidence rule which prohibits the admission of prior inconsistent agreements for the purpose of varying or contradicting an

17

agreement's unambiguous terms. *See Tri-Steel Structures*, 166 S.W.3d at 451. In the face of an integration clause, parol evidence, which allegedly arose prior to the clause's effective date, has no legal effect and, therefore, cannot be relied upon to establish waiver or estoppel. *See Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). We further note that Dr. Uwaydah judicially admitted that the Lease had not been modified and she unequivocally stated in her estoppel letter dated April 21, 2016 that the Lease had not been "altered or amended (in writing or orally)."

We hold that the trial court's finding that the Hospital waived its rights to collect late fees or evict Dr. Uwaydah is not supported by any evidence. *See Exxon Corp.*, 348 S.W.3d at 215.

## Breach of Contract

In its first issue, the Hospital argues that the trial court erred by rendering a take-nothing judgment against it on its breach of contract claim because the undisputed evidence conclusively established all vital facts in support of its claim. It argues that we should render judgment that it is entitled to recover $34,109.12 in breach of contract damages from Dr. Uwaydah because it conclusively established this fact at trial. The Hospital is also requesting that we render judgment awarding it $20,000 in attorney's fees. On appeal, Dr. Uwaydah does not disagree that the

18

Hospital met its burden of establishing its right to recover some amount of damages on its breach of contract claim against her.

## A. Applicable Law

"The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *Schlumberger Ltd. v. Rutherford*, 472 S.W.3d 881, 892 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (quotation omitted). "A breach occurs when a party fails or refuses to do something he has promised to do." *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

The universal rule for measuring breach of contract damages is just compensation for the loss or damage actually sustained. *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *see also Davis v. Chaparro*, 431 S.W.3d 717, 726 (Tex. App.—El Paso 2014, pet. denied). A non-breaching party is generally entitled to all actual damages necessary to put him in the same economic position he would have been had the contract not been breached. This is commonly referred to as the benefit of the bargain. *Davis*, 431 S.W.3d at 726 (citing *Bowen v. Robinson*, 227 S.W.3d 86, 96 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). Under the implementation of this rule, a party should not receive less or more than the actual

damages he incurred. *Davis*, 431 S.W.3d at 726 (citing *Abraxas Petroleum Corp.*, 20 S.W.3d at 760).

**B.      Liability and Damages**

The existence of the valid contract between the Hospital and Dr. Uwaydah, i.e., the Lease, is undisputed and demonstrated by the evidence admitted at trial, including the Lease itself, Dr. Uwaydah's deemed admissions, and the Tenant Estoppel Letter she executed prior to MOB 103's assignment of the Lease to the Hospital. Dr. Uwaydah's deemed admissions also provide further undisputed evidence supporting the other factual elements of the Hospital's breach of contract claim. *See generally* TEX. R. CIV. P. 198.3 (stating matter deemed admitted is conclusively established unless trial court, on motion, permits withdrawal or amendment of admission). Specifically, Dr. Uwaydah admitted that the Hospital "performed all of its contractual obligations required by the Lease" and that she "did not perform all of [her] obligations required by the Lease." She also admitted that she had "not paid Rent for May, June, July, August, September, October or November of 2016"[4] and that "[t]he last time [she was] current on Rent was on April 30, 2016."

---

4       Although the trial court found that "Dr. Uwaydah made a regular monthly payment" on May 1, 2016, the trial court's finding directly contradicts Dr. Uwaydah's admission that she did not pay rent that month. *See* TEX. R. CIV. P. 198.3 (matter admitted is conclusively established "as to the party making the admission"); *see also Vise v. Marshall*, 751 S.W.2d 216, 217 (Tex. App.—Houston [1st Dist.] 1988)

20

The Lease demonstrates that Dr. Uwaydah is obligated to pay $4,887.23 in monthly Rent on the 1st of each month ($4,719.06 in Base Rent, plus $168.17 in Additional Rent) and expressly allows the Hospital to assess late fees against Dr. Uwaydah in the event she is late paying Rent and that Dr. Uwaydah is obligated to pay such fees. The Hospital also produced a lease ledger showing $4,887.23 in Rent charges for the months of May, June, July, August, September, October, and November, and all late fees assessed during that period. The ledger further reflects that Dr. Uwaydah did not make any payments after April 2016 and that, after deducting the security deposit, Dr. Uwaydah had incurred an additional $34,109.12 in total charges.

Dr. Uwaydah does not dispute the accuracy of these amounts, she only disputes whether the Hospital is entitled to recover all of the charges set forth on the ledger. Specifically, Dr. Uwaydah argues that the Hospital cannot recover any outstanding late fees that she allegedly owes as a result of her failure to pay the Base Rent for May, June, July, August, September, and October 2016 because the Hospital waived its right to recover such fees by waiving previous late charges. As

(stating trial court may not find facts that are contrary to deemed admissions), *rev'd on other grounds*, 767 S.W.2d 699 (Tex. 1989). Furthermore, Dr. Uwaydah does not dispute that she owes Base Rent for May 2016.

previously discussed, the Hospital did not waive its right to recover any outstanding late fees.

Dr. Uwaydah further contends that she does not owe rent after October 31, 2016 because she was wrongfully evicted on that date. As later discussed, the trial court erred by rendering judgment in Dr. Uwaydah's favor on her wrongful eviction claim because she did not have a right to occupy the premises when she was evicted. Furthermore, the plain language of the Lease allows the Hospital to terminate the Lease if Dr. Uwaydah defaults, and upon termination, the Hospital "shall have the right to collect an amount equal to all expenses incurred by [the Hospital] in recovering possession of the Premises, including but not limited to . . . all past due Rent which is unpaid, plus interest thereon at the Interest Rate (as defined in Section 20.9); and the amount of Rent that would have been due for the remainder of the Term if the Lease had continued until the expiration of the Term." It is undisputed that Dr. Uwaydah defaulted on the Lease, the Hospital terminated the Lease, and the Lease's expiration date is March 31, 2018. Thus, under the plain and unambiguous language of the Lease, the Hospital is entitled to recover monthly Rent from Dr. Uwaydah until March 2018. The Hospital, however, is only requesting that Dr. Uwaydah pay Rent through the month of November 2016. *See Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56

(Tex. App.—Dallas 2006, pet. denied) (stating appellate courts review interpretation of unambiguous contracts de novo).

Thus, the undisputed evidence conclusively establishes all vital facts supporting each element of the Hospital's breach of contract claim against Dr. Uwaydah. *See Schlumberger Ltd.*, 472 S.W.3d at 892. Furthermore, based on our conclusion that the Hospital did not waive its right to assess and collect late fees as a matter of law and the undisputed evidence establishing the amount of unpaid Base Rent, Additional Rent, and late charges, which the Hospital is entitled to under the Lease, including charges incurred after October 31, 2016, as documented in the lease ledger, we further conclude that the Hospital has conclusively established that it is entitled to recover from Dr. Uwaydah $34,109.12 in breach of contract damages.

Accordingly, we reverse the take-nothing judgment and render judgment in the Hospital's favor on its breach of contract claim and render judgment that the Hospital is entitled to recover from Dr. Uwaydah $34,109.12 in breach of contract damages. *See Stephenson v. LeBoeuf*, 16 S.W.3d 829, 842 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (stating court of appeals has duty to render judgment trial court should have rendered but it may only do so when in cases where material facts are undisputed).

We sustain the Hospital's first issue.

## C.    Attorney's Fees

In addition to the $34,109.12 in breach of contract damages, the Hospital is also requesting that we render judgment awarding it $20,000.00 in reasonable and necessary attorney's fees for its breach of contract claim.

Ordinarily, the reasonableness of the amount of attorney's fees is left to the factfinder, and a reviewing court may not substitute its judgment for the jury's. *See Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009) (citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990)); *see also Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998) (noting that reasonableness and necessity of attorney's fees are questions of fact for factfinder's determination). However, when counsel's testimony regarding his fees is uncontroverted, clear, direct, and positive, and not contradicted by any other witness or attendant circumstances, and there is nothing to indicate otherwise, an appellate court may exercise its discretion and render judgment for attorney's fees in the interest of judicial economy. *See Ragsdale*, 801 S.W.2d at 882; *see also World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 684, 686 (Tex. App.—Fort Worth 1998, pet. denied) (citing *Ragsdale* and rendering judgment awarding attorney's fees on breach of contract claim). Because the trial court erroneously rendered a take-nothing judgment against the Hospital on its breach of contract claim, the court did not have an opportunity to consider the reasonableness and necessity of the Hospital's requested attorney's fees

24

of $20,000 in this case. *See generally Bocquet*, 972 S.W.2d at 21. Although this court has exercised its discretion and rendered judgment awarding attorney's fees in other cases, we decline to do so here, particularly given the amount of breach of contract damages in controversy. *See Cambio v. Briers*, No. 01-10-00807-CV, 2015 WL 2229274, at \*4–5 (Tex. App.—Houston [1st Dist.] May 12, 2015, no pet.) (mem. op.) (remanding for new trial on attorney's fees because trial court did not have opportunity to consider reasonableness and necessity of requested fees). *Cf. Goudeau v. Marquez*, 830 S.W.2d 681, 683–84 (Tex. App.—Houston [1st Dist.] 1992, no writ) (reforming trial court's judgment to include award of $790 in attorney's fees and affirming judgment as reformed).

Accordingly, we hold that the Hospital is entitled to attorney's fees under Chapter 38, and we remand for a new trial on this issue. *See Smith*, 296 S.W.3d at 548–49.

### Wrongful Eviction

In its second issue, the Hospital argues that the trial court erred by rendering judgment in Dr. Uwaydah's favor on her claim for wrongful eviction, and there is legally and factually insufficient evidence supporting the trial court's findings on this issue. In its fourth issue, the Hospital argues that the trial court erred by awarding Dr. Uwaydah her attorney's fees based on her wrongful eviction claim.

To establish a claim for wrongful eviction, a plaintiff must show: (1) she had an unexpired rental contract with the landlord; (2) she occupied the premises; (3) the landlord evicted her; and (4) she suffered damages attributable to the eviction. *McKenzie v. Carte*, 385 S.W.2d 520, 528 (Tex. App.—Corpus Christi 1964, writ ref'd n.r.e.). Thus, to prevail on her claim for wrongful eviction, Dr. Uwaydah was required to show that she had a right to occupy the premises when she was evicted. *See id.* (recognizing right to occupy premises and actual occupation of that premises as elements of claim for wrongful eviction).

It is undisputed that Dr. Uwaydah defaulted on the Lease by failing to pay Rent for several months and she was in breach of the Lease when the Hospital prevailed on its forcible detainer action against her. The plain language of the Lease gives the Hospital the right to evict Dr. Uwaydah from the Premises if she defaults on the Lease. Therefore, there is no evidence supporting the trial court's implied finding that Dr. Uwaydah had a right to occupy the premises when she was evicted. Because there is no evidence supporting this element of Dr. Uwaydah's claim, we hold that the trial court erred by rendering judgment in Dr. Uwaydah's favor on her wrongful eviction claim.

We reverse the trial court's judgment on this issue and render a take-nothing judgment against Dr. Uwaydah on her wrongful eviction claim.

26

Because Dr. Uwaydah's award of attorney's fees is predicated on her wrongful eviction claim, we reverse that award as well and render a take-nothing judgment against Dr. Uwaydah on her claim for such fees.

We sustain the Hospital's second and fourth issues.

## Negligence

In its third issue, the Hospital argues that the trial court erred by rendering judgment in Dr. Uwaydah's favor on her negligence claim because there is legally and factually insufficient evidence supporting (1) the finding that the Hospital's conduct was a proximate cause of Dr. Uwaydah's damages, and (2) the award of $32,000.00 in "lost income" because Dr. Uwaydah did not provide any evidence of her lost net profits, which is the proper measure of damages. On appeal, Dr. Uwaydah does not dispute that the appropriate measure of damages in this case is "lost profits," not "lost income."

"The proper measure of lost-profits damages is lost net profits, not lost gross profits." *Hoss v. Alardin*, 338 S.W.3d 635, 654 (Tex. App.—Dallas 2011, no pet.); *see also Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 n.1 (Tex. 1992). "Net profit" is the difference between a business's total receipts and all the expenses incurred in carrying on the business. *See Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Although Dr. Uwaydah provided rough estimates of the amount of revenue she lost from June 2016 to October 2016,

27

i.e., her lost gross profits, she did not testify to the amount of her lost net profits. She also failed to provide any evidence of her monthly expenses or overhead costs during this time. Without such evidence, there was no way for the trial court to have determined the amount of Dr. Uwaydah's lost net profits. *See Phan*, 137 S.W.3d at 771 (stating that business's net profit is difference between its total receipts and expenses). Because Dr. Uwaydah only presented estimates of her lost revenue, i.e., lost gross profits, and she did not provide any evidence of her monthly expenses or overhead costs, we hold that the evidence is legally insufficient to prove lost-profit damages. *See Holt Atherton*, 835 S.W.2d at 84 (holding that owner's testimony that he lost $200,200 in income was legally insufficient because it "d[id] not provide any indication of how [the owner] determined what [his] lost profits were"); *see also Phan*, 137 S.W.3d at 773 (holding evidence of lost profits damages legally insufficient because "the Owners failed to meet their burden of proving net profits, from which expenses had been subtracted" to arrive at lost profits).

We reverse the trial court's judgment and render a take-nothing judgment against Dr. Uwaydah on her negligence claim. *See Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 633–36, 645 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (reversing and rendering take nothing judgment on lost profit award where court determined evidence was legally insufficient to show any amount of lost profits).

28

We sustain the Hospital's third issue.

## Conclusion

We reverse the take-nothing judgment rendered against the Hospital on its breach of contract claim and render judgment in the Hospital's favor in the amount of $34,109.12. We remand the issue of the Hospital's attorney's fees for new trial.

We reverse the trial court's judgment on Dr. Uwaydah's wrongful eviction and negligence claims and render a take-nothing judgment against Dr. Uwaydah on both claims. Because Dr. Uwaydah's award of attorney's fees is predicated on her wrongful eviction claim, we reverse that award as well and render a take-nothing judgment against Dr. Uwaydah on her claim for such fees.

Russell Lloyd
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.